Mr. O'Mahon, you were court-appointed, were you? Yes, sir. Thank you for taking the case on behalf of the court. The next case is Jutta Spies v. Carolyn Colvin. May it please the court, good morning. Dana Duncan on behalf of the plaintiff, it's pronounced Jutta Spies. She's a German immigrant. This case is before the court after a hearing was first, there was a first remand by the Appeals Council, then a second hearing held by the ALJ. That decision is before the Court of Appeals. Her application date of October 8, 2008 was 43 years, 8 or 10 months. Her application date was April 9, 2012. Her date last insured December 31, 2013. The judge's decision was January of 14, thus precluding her from any further application for Title II benefits. I'm going to cut to the chase and skip a lot of the argument that I've basically been outlined here and just address the two primary issues. This is a fairly straightforward and simple case. We have two issues before the court. One is credibility, and in this particular case we have somebody who reported pain, and under the Social Security rules and case law, it indicates that subjective complaints of pain cannot be simply dismissed. There has to be some assessment. In this particular case, Ms. East suffered from neuropathy, which was noted repeatedly in the record by her physicians. She was a Type II diabetic and was having pain and problems in joints associated with her diabetes. She had osteoarthritis in the neck and shoulders. She received steroid injections. This is all the kind of stuff that would readily support somebody who's claiming that she's got subjective pain. So there is an objective basis for the condition, and that's the general standard. If you can have objective evidence that would support pain is likely, then assessment of pain is necessary. The judge in this particular case made two findings specifically on credibility. There's some that are implied by his assessment of the medical record, but the two primary ones are he cited Dr. Korshidi, the State As to her daily activities, I outlined in my brief that Dr. Korshidi's primary thing was, is she noted that Ms. Spies did shopping, but yet the judge never appeared or delved into anything that pertained to how she did her shopping. Was she using a motorized cart? Did she limit herself to shopping for only 10 minutes? This is not necessarily the type of activity that readily translates into the ability to perform the full time. Whose responsibility was it to develop that point? According to the case law, and this is an argument I've made repeatedly, Your Honor, in the court under Engstern and such, when a judge is going to make an adverse credibility finding, it's who's the judge to make an inquiry of the claimant. Because if you don't, if the judge looks at it and says, I think this might be a problem and doesn't ask, that would leave it to the counsel for the applicant to try to read through many times a thousand pages of records and try to guess what things the judge may find adverse. Oh, I mean, daily activities have to be considered, right? Correct. And in this particular case, she did testify to some extent about her daily activities, but not necessarily her shopping. I actually, and this is one of the few cases where I actually handled the hearing. And it's a normal practice to go through, how do you spend your day? What kind of activities do you do? But nothing was specifically addressed. It just seemed odd to me that the judge in this particular case wouldn't have even assessed his own credibility on daily activities and talked about what her testimony was, instead relying on the state agency doctor's assessment, who never had an opportunity to see the other information. At the time Dr. Korshidi did her assessment, there was a couple of years worth of additional records that were in the file that were never reviewed by Dr. Korshidi. The second point that the judge made on credibility was that she had, and I guess the best way to characterize it is canned answers. Well, first of all, the judge never elaborates what he found to be credible. He does imply, and there's a, I believe it's record page 56, he was surprised when he asked how high her feet needed to be elevated, and she said 12 to 15 inches, and his comment was, well that's rather precise. Well, that might be the case. If that's what the judge is referring to as being uncredible, it's surprising that that exact limitation was included in his residual functional capacity assessment. So he didn't find it completely unbelievable, because he adopted it. If it's something else, we have no idea what it is. I should also point out that if you look at the transcript itself and the exhibit list in the transcript, the numbers of exhibits start with B. That indicates that there was a prior application. So in essence, since there was a prior hearing that was remanded, and then this hearing, this would have been Ms. Spee's third chance to testify before an administrative law judge. I think she had some idea of what the questions were going to be, and what her answers were going to be. Now, we go now to the second issue, which is the treating physician. In this particular case, we have, the standard is, is that they're supposed to be controlling weight granted to a treating physician, unless there, it's not supported by the record, and it's not, and it's inconsistent with with the record, and with normal diagnostic techniques. But you can look through, as I pointed out, in the record, we have page 539, trigger point injections. We have myofacial pain diagnosed by the consultative exam, Dr. Allen, on June 19, 2012, at page 66, or 463. So it's hard to see where there is that inconsistencies. Even the x-rays themselves showed some. Now admittedly, it would have been nice if there would have been an MRI, but when you look at the record and see the number of times where they're complaining about the fact that she can't get treatment because she has no insurance, it seems rather difficult to believe that a medical facility would be volunteering to give her an MRI. The judge in this particular case gave two reasons then for discounting Dr. Weber's opinion. One, he indicated that she explained her basis for his opinion was required an evaluation with her subjective reports of numbness and tingling, citing exhibit B13F. That's incorrect. Dr. Webster specifically indicated that the need to elevate her legs was based on edema that was painful and that will alleviate the edema. Now the deconditioning aspect, which is the second part, that she'd need unscheduled breaks because of deconditioning, well she had severe problems with her neck resulting in trigger point injections and her inability to get or obtain the kind of pain medication she normally would have needed in order to deal with these. So really this is where the crux of the case lies and I don't see here that there is sufficient basis for discounting Dr. Webster's opinion. The judge doesn't say he gives it no weight, he gives it significant or substantial weight. We have no idea exactly what weight he actually gave it other than he adopted a large part of Dr. Webster's opinion but excluded the parts that would have resulted in the finding of disability without any explanation. So that's the case and I'm going to reserve what's left for rebuttal. Thank you, counsel. Good morning, may it please the court. My name is Meredith Schacht and I represent the Acting Commissioner of Social Security. I disagree with counsel's opinion that there were only two points for each of the ALJ's findings. I agree that the two matters at issue are credibility and treating physician. The ALJ, however, provided several supportable and appropriate reasons for his findings. With regard to credibility, the ALJ specifically identified Ms. Spee's a recognized appropriate reason to assess credibility. There's great deference given to the ALJ's observation of the individual during hearing for the precise reason that appearance and demeanor and tone during hearing aren't represented in the hard transcript of the hearing and the ALJ is the individual who had the opportunity to observe those things and to assess their testimony given. The ALJ, though, also noted other reasons for his credibility determination. He noted that her alleged limitations were not supported by objective medical evidence, that is not supported by imaging, but also not supported by clinical examination. There's very little to suggest the she alleges suffering. The ALJ then also noted Ms. Spee's daily activities and that those were not consistent with her extreme limitations and he didn't just consider this in the context of Dr. Khorshidi's opinion, although he did note that Dr. Khorshidi also recognized the inconsistency between the Does she have both arthritis and diabetes? She does have diabetes. There is not much in the record about arthritis, but the ALJ accepted that there was sufficient evidence to to establish that she did have the impairment of osteoarthritis. And certainly those could produce limitations, Your Honor, but Ms. Spee's was asserting very significant limitations here. She said she could walk for maybe five minutes. That's what she said at hearing. She could stand for ten minutes. She could only sit for ten minutes. These were significant limitations. She said she, she testified that she was dropping gallons of milk. She couldn't lift anything greater than that, that there were days she couldn't even lift her arms. However, that's not reflected in any of the medical records. Certainly her complaints of pain were reflected, but there's never any indication in the medical records that she should be treated with something greater than over-the-counter pain medications. On one instance she was prescribed muscle relaxant, which she took for a little while. As counsel pointed out, on one instance she received trigger point injections to address her pain. She, she received those in 2009. There's no indication that she sought them again. There's no indication that any doctor opined that, that they were appropriate to receive them. The records indicate that she was treated with over-the-counter medication, and despite her complaints, no doctor recommended any more significant, any more significant treatment than that. Counsel suggested that, that claimant couldn't get the medication that she, that she needed. She had an inability to obtain pain medications, but there's no indication in the record that additional pain medications were recommended or that she was unable to obtain medication that was recommended. Certainly she had financial difficulties, but she obtained all of her other medications through patient assistance, and there's no indication that she was unable to obtain necessary care. With regard to the treating physician opinion, Dr. Webster's opinion, the ALJ also provided several reasons, appropriate reasons, for treatment. First, the ALJ noted that Dr. Webster's opinion appears to be based entirely on Ms. Spee's subjective reports, as this court has frequently acknowledged. That is, if the subjective reports are determined to be unreliable, an opinion based on those subjective reports is also appropriately found unreliable. In this case, the ALJ noted that the exam findings that Dr., from Dr. Webster's exams did not support her conclusions. There's nothing in the exam findings that explain her conclusions. In fact, Dr. Webster noted that she did not have sufficient information to assess Ms. Spee's ability to lift, to walk, to stand. She acknowledged, Dr. Webster acknowledged that she did not have sufficient information to assess the impact of Ms. Spee's ability to concentrate or to assess any kind of medication side effects, which really leaves... This was all on one of the forms? Yes, she submitted, she submitted a form in 2009, then she submitted an explanation of some of her responses on the form in 2010, and then a subsequent letter, I believe, in 2013, where she indicates she did not have sufficient information to assess the impact of Ms. Spee's pain. And we're looking here at what time period, because of the prior decision? The prior decision was through 2010, I believe. The alleged onset date was amended at hearing to October 1st of 2012, so the actual... The prior decision means no disability up to the date of the decision by the ALJ, right? That's true, yeah. Okay, and that was when? I believe that was 2012, I'm sorry, 2010. I'm not sure if we have a copy of that in the record. But at hearing and then with a form submitted after hearing, Ms. Spee's actually amended her asserted onset date to October 2012, which she said at hearing coincided with a decline in her situation and her symptoms. However, the ALJ noted that there's nothing in the medical record to indicate a decline at that time. Counsel, can I just ask you about, there's something kind of unusual about the ALJ's opinion here. I've frankly never seen this before in a case where disability is a vocational capacity, that she would need to be off task up to 10% of the work period in addition to regularly scheduled breaks. Why isn't that sufficient to show disability? The vocational expert testified, I believe, that up to 10% of the time, being off task up to 10% of the time is within acceptable limits by employers. That's, you know, transition time from one task to the next. In this case, I believe it addresses her need to switch between sitting and standing at will, which he included in the RFC, and of course that might distract you for a moment as you're rising from your chair, but there's no indication that it would have taken her off task for a significant amount of time. So the ALJ, I believe, included that as a response to that need to sit and stand. It said in that same section, Judge Posner wrote an opinion recently, why do we still include things like climbing ropes? Well, I think some of that is habit and tradition. Well, I guess. Certainly, it's a limitation that she suffers here. The ALJ is not suggesting that she's able to climb ropes. I don't know how many people in this room would climb. I prefer not to. Certainly. It doesn't make any difference. Yeah, it doesn't have an outcome on the case, but it is kind of an odd inclusion reference to scaffolds and ropes that are a bit outdated. It's not odd inclusion. It's always included, but they're frequently included. So on that, Your Honors, unless you have further questions, we would ask that you affirm the lower court's decision and the ALJ's decision in this matter. Thank you. Thank you, Counsel.  All right. Very quickly. Demeanor and appearance, as Counsel indicated, there's nothing really outlined in this decision that specifically addresses demeanor and appearance. There just isn't, other than that one statement about her answers. Objective evidence, we have evidence of steroid injections. We have evidence of stenosis in the cervical spine. We have the fact that she only got her pain medication or muscle relaxants when the doctor gave her a prescription to take to a free clinic, which is noted that that was her only treatment through most of 2012. As for her daily activities, there really isn't a lot. And I would just point out that the one thing that they talk about this, that Dr. Webster's opinion is not supported. In the letter she submitted to Counsel back in 2012, she outlined exactly what her opinion was. On November 17th, 2010, she said the need to elevate legs is due to swelling in the lower extremity, and that her need for unscheduled breaks were due to deconditioning as well as intermittent pain in her upper back and neck. And that's going to need, she'll need breaks to be able to move around and decrease this comfort. Where do we find that in the records? My hole punch cut off the page number. Let's see, I can find it very quickly. Helps to translate the entire record into a chronological schedule so you can find stuff. 556, it's Exhibit 13F, page 2. Doesn't that predate the previous denial of benefits? Correct, but the previous denial of benefits was remanded. We have a denial and no appeal. Then we had a second application filed. That was heard by Judge Allgren. That was remanded by the Appeals Council. And then another hearing was held by Judge Jacobson, which is the decision here. So the second application goes back to the original onset of 2008. We amended it 2012 because at that time she started having more significant problems that corresponded more with what the record showed. And quite frankly, it's a strategic decision on what you would have as your onset date based on what you see in the record and the way your relationship is with ALJ. I'm out of time. I thank you for your attention. Thank you. Thanks to both counsel. Mr. Duncan, did you take this case by appointment? No. Thank you very much for taking the case. We appreciate your fine work. The case will be taken under advisement, and we move to the hearing.